**[J-76-2021] [MO: Dougherty, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 17 EAP 2021 |
| | : | |
| Appellant | : | Appeal from the Judgment of |
| | : | Superior Court entered on 9/4/2020 |
| | : | at No. 148 EDA 2020 Quashing the |
| v. | : | appeal from the order entered on |
| | : | 12/30/2019 in the Court of Common |
| | : | Pleas, Philadelphia County, Criminal |
| RYAN POWNALL, | : | Division at No. CP-51-CR-0007307- |
| | : | 2018. |
| Appellee | : | |
| | : | ARGUED: December 7, 2021 |

**CONCURRING OPINION**

**JUSTICE DOUGHERTY**                                          **DECIDED: July 20, 2022**

A special concurrence is unusual.[1] But so is the Philadelphia District Attorney's

Office's ("DAO") prosecution in this case. That is why I feel compelled to write separately,

unconstrained by majority authorship, to pull back the curtain on some of the concerning

irregularities that lurk just beneath the surface of this appeal.

First, though, I must comment on an aspect of this case that regrettably is not so

unusual: it involves yet another young life lost — again in my own hometown of

---

[1] Fortunately, I find myself in good company in this regard. *See In re Adoption of M.R.D.*, 145 A.3d 1117, 1133 n.1 (Pa. 2016) (Todd, J., specially concurring) ("As members of this Court have previously noted, special concurrences are 'somewhat unusual, but not without precedent.'"), *quoting Commonwealth v. King*, 57 A.3d 607, 633 n.1 (Pa. 2012) (Saylor, J., specially concurring); *accord In re Bruno*, 101 A.3d 635, 689 n.1 (Pa. 2014) (Castille, C.J., specially concurring); *see also Wheeling Steel Corp. v. Glander*, 337 U.S. 562, 576 (1949) (Jackson, J., specially concurring) ("It cannot be suggested that in cases where the author is the mere instrument of the Court he must forego expression of his own convictions.").

Philadelphia — following an interaction with the police. Without expressing any view whatsoever about this particular case, I simply remark that what allegedly occurred here has become a far-too-familiar story, in this Commonwealth and beyond it. *See Police Shootings Database*, WASH. POST, https://wapo.st/3495bVY (last visited July 19, 2022) (reporting 156 people shot and killed by police in Pennsylvania since 2015, and more than 7,000 nationally). These tragic recurrences come at a steep and potentially irreversible cost. *See, e.g.*, *Amicus* ACLU of Pennsylvania's Brief at 10-11 ("the continuing use of deadly force by police . . . erodes the ability of communities to trust the police and their willingness to work with the police to address crime"); *Amicus* Current and Former Elected Prosecutors' Brief at 3 ("without accountability, there can be no public trust between law enforcement and the community, and especially, communities of color"); *id.* at 16 ("trust in government . . . is integral to promoting and preserving public safety"). Frankly, we can no longer afford to turn a blind eye to the problem; it "warrants serious examination, by every facet of government as well as those outside of it." Majority Opinion at 34.[2]

At the same time, we must not lose sight of the fact that "[o]ur communities rely on locally elected prosecutors . . . to ensure that their criminal legal system treats everyone fairly and equally, and follows the dictates of the Constitution." *Amicus* Current and Former Elected Prosecutors' Brief at 22. This includes police officers charged with a crime. Yet, here, I cannot say the DAO has treated Pownall fairly and equally. At least three aspects of the DAO's prosecution give me serious pause: (1) its failure to provide the investigating grand jury with all relevant legal definitions; (2) its successful attempt to

---

[2] I observe a bill was recently introduced in the legislature that seeks to amend the peace officer justification defense to allow the use of deadly force during an arrest only if the officer reasonably believes such force is necessary to "protect himself or another from imminent death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat." H.B. No. 2556, P.N. 3062 (Apr. 27, 2022).

deny Pownall a preliminary hearing; and (3) its relentless but unsuccessful attempt to change the peace officer justification law prior to Pownall's trial. I examine each in turn.

## (1) The Investigating Grand Jury Instructions

County investigating grand juries, like all other investigating grand juries (*i.e.*, multi-county and statewide), are a pure creature of statute. To summon an investigating grand jury a prosecutor must allege in an application to the president judge in the county that convening a grand jury "is necessary because of the existence of criminal activity within the county which can best be fully investigated using the investigative resources of the grand jury." 42 Pa.C.S. §4543(b).[3] If the application is approved and a grand jury is empaneled, the prosecutor may submit to it an investigation after notifying the supervising judge and alleging "one or more of the investigative resources of the grand jury are required in order to adequately investigate the matter." 42 Pa.C.S. §4550(a).

Once an investigation is in the grand jury's hands it has "the power to inquire into offenses against the criminal laws of the Commonwealth alleged to have been committed within the county . . . in which it is summoned." 42 Pa.C.S. §4548(a). If it "appears" to the grand jury a criminal offense has been committed, it may "issue a presentment[.]" *Id.* at §4548(b). A presentment does not initiate a criminal prosecution; it is "[a] written formal recommendation by an investigating grand jury that specific persons be charged with

---

[3] The "investigative resources of the grand jury" are defined as:

> The power to compel the attendance of investigating witnesses; the power to compel the testimony of investigating witnesses under oath; the power to take investigating testimony from witnesses who have been granted immunity; the power to require the production of documents, records and other evidence; the power to obtain the initiation of civil and criminal contempt proceedings; and every investigative power of any grand jury of the Commonwealth.

42 Pa.C.S. §4542.

specific crimes." 42 Pa.C.S. §4542. The process for issuing a presentment is spelled out in Section 4551 of the Investigating Grand Jury Act:

> Should the investigating grand jury determine that upon the basis of evidence presented to it a presentment should be returned against an individual, the grand jury shall direct the attorney for the Commonwealth to prepare a presentment which shall be submitted to the investigating grand jury for a vote. Should a majority of the full grand jury vote approval for the presentment it shall then be submitted to the supervising judge. The supervising judge shall examine the presentment, and if it is within the authority of the investigating grand jury and is otherwise in accordance with the provisions of this subchapter, the supervising judge shall issue an order accepting the presentment. Otherwise, the supervising judge shall refuse to accept the presentment and shall order that the investigating grand jury take further appropriate action.

42 Pa.C.S. §4551(a).

Significantly, the Act excepts "the power to indict" from the otherwise expansive powers bestowed upon an investigating grand jury. 42 Pa.C.S. §4548(c). As such, when "the Commonwealth proceeds on the basis of a presentment," it must then file a criminal complaint, after which "the defendant shall be entitled to a preliminary hearing as in other criminal proceedings." 42 Pa.C.S. §4551(e).

Here, the DAO chose to submit its investigation of Pownall to the Twenty-Ninth Philadelphia County Investigating Grand Jury. I generally discern nothing wrong with that approach, so long as the DAO truly believed one or more of the investigative resources of the grand jury was required to adequately investigate the case. *See* 42 Pa.C.S. §4550(a). Rather, it is the manner in which the DAO seems to have directed the grand jury's investigation that appears troubling.

On December 11, 2019, the supervising judge directed the DAO to turn over to Pownall the legal instructions given to the grand jury, as well as transcripts of those proceedings. Based on the materials produced, Pownall filed a motion to quash the presentment only days later. His motion alleged the DAO

intentionally failed to notify the [g]rand [j]ury of the [peace officer justification defense under 18 Pa.C.S. §508], well knowing that to do so would have prevented the grand jury from recommending criminal charges. However, the misconduct did not end there. The prosecution then asked the grand jury to return a presentment on homicide charges which included murder, voluntary manslaughter, and involuntary manslaughter, without defining any of those charges. This grand jury had no idea that they would have [ ] to have found from the evidence that [ ] Pownall acted with **premeditation** for murder of the first degree, **malice** for any form of murder, a **mistaken belief in self defense** for voluntary manslaughter, or **criminal recklessness** for involuntary manslaughter. This may be [the] first time in the history of Pennsylvania jurisprudence that a District Attorney requested a grand jury to authorize criminal charges without explaining the law that applies to those charges because to do so would have prevented a finding of probable cause.

Memorandum of Law in Support of Motion to Quash Presentment and for Dismissal of All Charges, 12/18/2019 at 6 (emphasis in original); *see id.* at 11 ("The [DAO] had a legal and moral obligation to inform the grand jury of the law so that a fair and just probable cause determination could be made.").

In my view, if these allegations are true, as they appear to be,[4] it implicates a potential abuse of the grand jury process. Nearly a century ago this Court stated what

---

[4] The record presently before us includes the limited and partially redacted materials the DAO disclosed to Pownall at the supervising judge's direction. Those materials were accompanied by a letter which refers to "[a]ttached [d]efinitions" that were "distributed to [the g]rand [j]urors on August 23, 2018[.]" DAO's Letter, 12/12/2019 at 1. This document says nothing of Section 508; further, it supports Pownall's position the DAO provided a definition only for "criminal homicide" generally under 18 Pa.C.S. §2501, without defining any of the types of homicide set forth in 18 Pa.C.S. §2502 (murder), §2503 (voluntary manslaughter), or §2504 (involuntary manslaughter). It stated:

**Criminal Homicide, 18 Pa.C.S. §2501**

To find that this charge has been established, you must find probable cause that:

Ryan Pownall intentionally, knowingly, recklessly or negligently caused the death of David Jones.

A killing is considered criminal homicide if someone intentionally, knowingly, recklessly or negligently causes the death of another human being.

should be apparent: "The grand jury must know what crimes it is to investigate." *Petition of McNair*, 187 A. 498, 505 (Pa. 1936). Yet, the DAO appears to have obtained a presentment in this case without providing the grand jury the definition for the crime that was actually charged in the subsequent complaint (third-degree murder), or the possible justification for that criminal offense. *See generally Commonwealth v. French*, 611 A.2d 175, 178 (Pa. 1992) ("Whether an arresting officer's use of [deadly] force is unlawful is determined with reference to [Section] 508 of the Crimes Code[.]").[5] Moreover, by failing to provide the grand jury with all relevant legal instructions, it also necessarily raises questions about the completeness of the factual record the DAO presented to the grand jury. In short, by depriving the grand jury of the full panoply of relevant legal definitions, the DAO has exposed the grand jury's resulting presentment to legitimate attack.

In fact, given the circumstances, the presentment in this case is perhaps best characterized as a "foul blow." We recently took note of the hostility an appellate court in

---

Criminal homicide includes murder, voluntary murder, voluntary manslaughter, or involuntary manslaughter.

Definitions Provided to Grand Jury, 8/23/2018. This contrasts with the crimes alleged by the DAO when it submitted the investigation to the grand jury four months earlier. At that time, the transcripts reveal, the DAO announced it was specifically recommending murder under Section 2502, without mentioning criminal homicide under Section 2501.

[5] We have explained the structure of Chapter 25 of the Crimes Code "create[s] one major homicide offense, that of criminal homicide, and [ ] the several types of homicide . . . are constituent subsidiary offenses within the single major offense." *Commonwealth v. Polimeni*, 378 A.2d 1189, 1194 (Pa. 1977) (plurality). This arguably undermines Pownall's claim the DAO was required to furnish the grand jury with the definitions for all "lesser included offenses of the overall crime of criminal homicide." *Id.* at 1194-95. Still, there is logical force to Pownall's argument since "[t]he differences between the classifications [of homicide] are largely a function of the state of mind of the perpetrator." *Id.* at 1195. By ultimately seeking a recommendation only for criminal homicide generally, the DAO avoided the need to present any evidence concerning Pownall's mental state. Even if this is legally permissible, when coupled with the other strategies employed by the DAO discussed below, it nevertheless raises genuine fairness concerns.

New York expressed towards grand jury presentments, before the advent there of statutory procedural safeguards:

> "A presentment is a foul blow. It wins the importance of a judicial document; yet it lacks its principal attributes — the right to answer and to appeal. It accuses but furnishes no forum for a denial. No one knows upon what evidence the findings are based. An indictment may be challenged — even defeated. The presentment is immune. It is like the 'hit and run' motorist. Before application can be made to suppress it, it is the subject of public gossip. The damage is done. The injury it may unjustly inflict may never be healed."

*In re Fortieth Statewide Investigating Grand Jury*, 190 A.3d 560, 570 (Pa. 2018), *quoting People v. McCabe*, 266 N.Y.S. 363, 367 (N.Y. Sup. Ct. 1933). Historically, we have not taken the same dim view of grand jury presentments. Despite being "cognizant that the substantial powers exercised by investigating grand juries, as well as the secrecy in which the proceedings are conducted, yields the potential for abuses[,]" we believed close supervision by the judiciary and "adherence to the statutory framework is adequate to assure regularity in the proceedings." *In re Twenty-Fourth Statewide Investigating Grand Jury*, 907 A.2d 505, 512 (Pa. 2006) (internal footnote omitted). I fear this case indicates otherwise.

The grand jury's presentment epitomizes my concern. As discussed, the grand jury approved it without full knowledge of the pertinent law. That is disconcerting enough. Equally disturbing, though, is the presentment itself. It is thirteen pages long and includes an introduction, closing, and seventy-four purported factual findings. There is no discussion of the law, except for the recommended charges (which, again, do not include third-degree murder) listed on the final page. Also significant is the way the prosecution used the presentment. The DAO successfully moved to unseal it and then, after charging Pownall, directed the press to its purported factual findings. Not surprisingly, multiple

news sources reported on the presentment's one-sided account, with some even making the full document available online for anyone and everyone to read.[6]

It is important to recall the Investigating Grand Jury Act defines a presentment merely as "[a] written formal recommendation . . . that specific persons be charged with specific crimes." 42 Pa.C.S. §4542. Nothing in this definition appears to endorse the type of gratuitous narrative provided in this case. Of course, it is anticipated that grand jury presentments will be somewhat biased; this is the unavoidable result of the Act requiring "the attorney for the Commonwealth" to prepare the presentment and submit it to the grand jury for a vote. 42 Pa.C.S. §4551(a). If a grand jury is inclined to recommend charges against a person, the attorney for the Commonwealth tasked with drafting the presentment naturally will tend to favor those facts and theories most helpful to its future prosecution. Nevertheless, before endorsing the Commonwealth's portrayal of a case, the grand jury must at a minimum be advised of the full breadth of the applicable law. That deficiency here renders the entire presentment suspect.

### (2) The Preliminary Hearing Bypass Motion

That the DAO provided the grand jury with a less-than-complete picture of the applicable law is not the most troubling part. Theoretically, that error could have been remedied by adherence to one of the statutory safeguards embedded in the process: the requirement that "the defendant shall be entitled to a preliminary hearing[.]" 42 Pa.C.S. §4551(e). What is troubling is the DAO's effort to ensure that would not occur.

---

[6] Ordinarily, I would provide these links for the benefit of the reader. I decline to do so here because it would only further erode Pownall's ability to receive a fair trial. In any event, I observe the DAO does not contest this extensive media coverage exists. *See* DAO's Brief on Defense's Motion for Change of Venire, 5/21/2019 at 3 (admitting at least "a dozen articles reference the presentment, DAO press conference, or quote a DAO spokesperson"); *id.* at 5 (tallying "105 local articles" related to Pownall's case).

One week after charging Pownall the DAO filed a "Petition to File Bill of Information Without a Preliminary Hearing," commonly known as a bypass motion. *See* Pa.R.Crim.P. 565(A) ("When the attorney for the Commonwealth certifies . . . that a preliminary hearing cannot be held for a defendant for good cause, the court may grant leave to the attorney for the Commonwealth to file an information with the court without a preliminary hearing."). According to the DAO, three factors "compell[ed] a preliminary hearing bypass . . . here: complexity, expense, and the prosecution's offer of discovery to [Pownall]." Bypass Motion, 9/13/2018 at 4.

With respect to complexity, the DAO stated over a dozen witnesses testified before the grand jury and "many" of them would have to testify again if the case proceeded to a preliminary hearing. *See id.* at 1-4. In the DAO's view, "the delay occasioned by [recalling these witnesses] would run afoul of [this] Court's repeatedly expressed concern for superfluous delay." *Id.* at 4 (citations omitted).[7] As for expense, the DAO lamented that "multiple police personnel and a doctor from the Medical Examiner's Office would [have to] be subpoenaed to testify[.]" *Id.* at 5. Lastly, the DAO explained it made an "enormous concession" by agreeing to provide Pownall with all discovery and redacted notes of testimony from those witnesses who testified before the grand jury within sixty days of trial. *Id.* (emphasis omitted).

To support its position Pownall was not entitled to a preliminary hearing, the DAO pointed to *Commonwealth v. Bestwick*, 414 A.2d 1373 (Pa. 1980). There, we reaffirmed the principle that "'an investigating grand jury presentment is a constitutionally permissible

---

[7] Pownall has yet to go to trial nearly four years after his arrest. Since this is due entirely to the DAO's litigation strategy, its expressed concern for "superfluous delay" is incredible. It's also "logically untenable: bypassing the preliminary hearing would **always** spare the court from delay, and there would be no need to have a preliminary hearing in any case if preventing delay constituted 'good cause.'" Pownall's Objection to DAO's Bypass Motion, 9/14/2018 at 6 (emphasis in original).

and reasonable alternative to a preliminary hearing.'" *Id.* at 1377, *quoting Commonwealth v. McCloskey*, 277 A.2d 764, 776 (Pa. 1971). Importantly, though, *Bestwick* went on to explain this "controversy has been settled by the legislature" through its adoption of the Investigating Grand Jury Act — in particular, Section 4551(e)'s directive that "the defendant shall be entitled to a preliminary hearing[.]" *Id.* at 1377 n.2 (internal quotations and citation omitted). Thus, while a preliminary hearing may not be required in any type of case as a constitutional matter, *Bestwick* recognized the General Assembly granted a statutory right to such a hearing when the Commonwealth elects to proceed by way of a presentment issued by an investigating grand jury. The DAO's failure to identify this distinction in its motion was inexplicable.

The DAO's reliance on Rule of Criminal Procedure 565 was also misplaced. Our rules contemplate a general defense "right to have a preliminary hearing, except in cases being presented to an **indicting** grand jury[.]" Pa.R.Crim.P. 540(F)(2) (emphasis added). Since 2012, this Court has authorized "the use of an indicting grand jury as an alternative to the preliminary hearing but only in cases in which witness intimidation has occurred, is occurring, or is likely to occur." Pa.R.Crim.P. 556, Comment. Rule 565, in turn, provides that, in non-grand jury cases, "[w]hen the attorney for the Commonwealth certifies to the court . . . that a preliminary hearing cannot be held for a defendant for good cause, the court may grant leave to the attorney for the Commonwealth to file an information with the court without a preliminary hearing." Pa.R.Crim.P. 565(A).

That Rule 565 does not apply in this situation is made evident by our decision in *McCloskey, supra*. In that case, we held "an **indictment** based upon an investigating grand jury's presentment" was "lawful, even though no preliminary hearing was held." *McCloskey*, 277 A.2d at 766 (emphasis added); *see id.* at 774 ("the omission of a preliminary hearing for a defendant **indicted pursuant to a presentment**" does not "in

any way prejudice[ ] him, or den[y] him a greater degree of protection than is available to a defendant in a criminal proceeding instituted by complaint and preliminary hearing.") (emphasis added). Nothing in our decision in *McCloskey* so much as hinted that a grand jury presentment, in the absence of an indictment, is a proper substitute for a preliminary hearing. Even in *Bestwick*, the defendant "was indicted" after the investigating grand jury issued its presentment. 414 A.2d at 1375.[8] Tellingly, our rules now reflect the limited scenario we endorsed in *McCloskey* and *Bestwick*, but not the broader position staked out by the DAO. *See, e.g.*, Pa.R.Crim.P. 556.11 (permitting indicting grand jury to issue an indictment based "upon a presentment issued by an investigating grand jury," but only "if the grand jury finds the evidence establishes a *prima facie* case that (1) an offense has been committed and (2) the defendant has committed it").[9]

Remarkably, the DAO appears to have known all this at the time it filed its motion. *See* DAO's Bypass Motion, 9/13/2018 at 6 (admitting it "could conceivably present the Investigating Grand Jury presentment to the Indicting Grand Jury, as happened . . . in

---

[8] In its bypass motion, the DAO relied on what appears to be the only reported decision in which the Commonwealth successfully evaded a preliminary hearing based solely on a grand jury presentment — *i.e.*, without an indictment. *See* DAO's Bypass Motion, 9/13/2018 at 3-5, *citing Commonwealth v. Cassidy*, 620 A.2d 9 (Pa. Super. 1993). That thirty-year-old decision of the Superior Court does not, of course, bind this Court; and, it is dubious at best, because the panel did not so much as cite to Section 4551(e) let alone explain how its plain terms could be avoided.

[9] Even if Rule 565 extended to presentments, the DAO clearly did not demonstrate "good cause" here. The comment to the rule explains the use of a preliminary hearing bypass is "limited to exceptional circumstances only." Pa.R.Crim.P. 565, Comment. According to Pownall, Assistant District Attorney Tracy Tripp ("ADA Tripp") informed the assigned preliminary hearing judge (before it was bypassed) that the hearing could be conducted in only "two [to] three hours." Pownall's Supplemental Objection to DAO's Bypass Motion, 9/25/2018 at 3. As Pownall aptly remarked, this "would be the standard length of any [h]omicide preliminary hearing . . . on any given day." *Id.* Indeed, given Pownall's willingness "to stipulate to the various physical and forensic evidence," he anticipated the DAO might only need "to present two or three live witnesses and a video." *Id.* That hardly demonstrates good cause.

*McCloskey*"). Yet, it pressed forward anyway, curiously arguing a preliminary hearing would somehow "undermine the [g]rand [j]ury's hard work[.]" *Id.* One implication of this statement is that a preliminary hearing would have exposed the DAO's questionable means of obtaining the grand jury's presentment; another is that it might have led to the dismissal of some or all charges. Regardless, it is disturbing that the DAO went to such lengths to deprive Pownall of his statutory right to a preliminary hearing.[10]

**(3) The Motion in Limine & Interlocutory Appeal**

Finally, I turn to the DAO's motion in limine concerning Suggested Standard Jury Instruction (Crim) §9.508B. The majority opinion describes the contents of the DAO's motion at length, so I do not repeat them here. *See* Majority Opinion at 4-12. Instead, I will focus on two aspects of the motion that warrant further scrutiny: (1) the DAO's lack of candor with respect to its underlying constitutional claim; and (2) the questionable timing of the motion's filing and subsequent appeal.

Regarding the High Court's decision in *Tennessee v. Garner*, 471 U.S. 1 (1985), the majority notes the DAO neglected to acknowledge a key paragraph from that decision which seemingly undercuts its argument. *See* Majority Opinion at 8-9, *quoting Garner*, 471 U.S. at 11-12 (declaring it constitutionally reasonable under the Fourth Amendment to use deadly force "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm[,]" including when "the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime

---

[10] I recognize the supervising judge acceded to the DAO's bypass request. Unfortunately, we have no record of what occurred at the hearing on that motion. *See* Motion in Limine, 11/25/2019 at 2 n.1 (explaining the notes from the bypass hearing are irretrievably lost "because the stenographer transcribing that day has left the jurisdiction and failed to produce either the transcript or the original stenotype, preventing transcription"). For that reason, I do not address the supervising judge's role in this situation.

involving the infliction or threatened infliction of serious physical harm"). But several other omissions by the DAO also merit discussion.

First is the supremely relevant fact that *Garner* actually references Section 508. In order to evaluate the reasonableness of the conduct at issue in that case, the Supreme Court "looked to prevailing rules in individual jurisdictions." *Garner*, 471 U.S. at 15-16. Its country-wide survey revealed approximately nineteen states at the time that had "codified the common-law rule," four that "retain[ed] the common-law rule[,]" two that "adopted the Model Penal Code's provision[11] verbatim[,]" and eighteen others that "allow, in slightly varying language, the use of deadly force only if the suspect has committed a felony involving the use or threat of physical or deadly force, or is escaping with a deadly weapon, or is likely to endanger life or inflict serious physical injury if not arrested." *Id.* at 16-17 (footnoted citations omitted). Section 508 falls within this latter category, as noted in *Garner*. *See id.* at 17 n.18, *citing* 18 Pa.C.S. §508.

This is important, because it places us among those states that have joined "the long-term movement . . . away from the rule that deadly force may be used against any fleeing felon[.]" *Id.* at 18. In fact, for most of this Commonwealth's history we "followed the common law rule that if the felon flees and his arrest cannot be effected without killing him, the killing is justified." *Commonwealth v. Chermansky*, 242 A.2d 237, 239-40 (Pa. 1968). Over time, however, we felt the "[s]tatutory expansion of the class of felonies ha[d] made the common law rule manifestly inadequate for modern law[,]" so we narrowed it. *Id.* at 240. In *Chermansky*, we declared that "from this date forward" the use of deadly force to prevent the escape of a fleeing felon "is justified only if the felony committed is treason, murder, voluntary manslaughter, mayhem, arson, robbery, common law rape, common law burglary, kidnapping, assault with intent to murder, rape or rob, or a felony

---

[11] *See* MODEL PENAL CODE §3.07 (Proposed Official Draft 1962).

which normally causes or threatens death or great bodily harm." *Id.* Then, four years later, our legislature abandoned the common-law rule altogether by adopting Section 508 of the Crimes Code.

Returning to *Garner*, the Third Circuit has deemed it relevant that the High Court in that case cited Section 508 "in developing [its] constitutional standard." *In re City of Phila. Litig.*, 49 F.3d 945, 953 n.5 (3d Cir. 1995); *see id.* at 979 n.2 (Lewis, J., concurring in part) ("the decision in [*Garner*] in significant respects mirrored, and in fact relied in part upon, [S]ection 508"); *see also Estate of Fortunato v. Handler*, 969 F. Supp. 963, 974 (W.D.Pa. 1996) (Section 508 "received the seal of approval" in *Garner*); *Africa v. City of Phila.*, 809 F. Supp. 375, 380 (E.D.Pa. 1992) (Section 508 was "noted with apparent favor" in *Garner*). This position finds support in *Garner* itself. To buttress its decision to pivot away from the harsh common-law rule, the Court observed "[t]here has been no suggestion that crime has worsened in any way in jurisdictions that have adopted, by legislation or departmental policy, rules similar to that announced today." *Garner*, 471 U.S. at 19. The Court appears to have been referring to statutes like Section 508, as demonstrated by the next paragraph, which states: "Nor is there any indication that in States that allow the use of deadly force only against dangerous suspects, *see* [footnote referencing Section 508], the standard has been difficult to apply or has led to a rash of litigation involving inappropriate second-guessing of police officers' split-second decisions." *Id.* at 20. In other words, the Court apparently believed Section 508 adheres to "the standard" it ultimately adopted in *Garner*. *Id.*

Notwithstanding the obvious relevance of this aspect of *Garner*, the DAO said nothing about it in its motion. It also failed to mention the *Garner* Court did not hold the Tennessee statute "unconstitutional on its face" — it was merely an as-applied holding. *Id.* at 11; *see id.* at 11-12 (explaining the statute "would pass constitutional muster" if

applied in certain other situations, such as "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others"). And, the DAO likewise failed to address the import of *Garner* arising in the context of a Section 1983 civil action. That fact has led at least three state supreme courts to reject the position the DAO now asks us to embrace. *See State v. Cooney*, 463 S.E. 2d 597, 599 (S.C. 1995) ("the holding in *Garner* . . . does not change the State's criminal law"); *People v. Couch*, 461 N.W.2d 683, 684 (Mich. 1990) (*Garner* "did not 'automatically' modify this state's criminal law with respect to the use of deadly force to apprehend a fleeing felon"; "the power to define conduct as a state criminal offense lies with the individual states, not with the . . . United States Supreme Court") (emphasis omitted); *State v. Clothier*, 753 P.2d 1267 (Kan. 1988) (*Garner* "has no application in a criminal case"); *see also* Chad Flanders & Joseph Welling, *Police Use of Deadly Force: State Statutes 30 Years After* Garner, 35 St. Louis U. Pub. L. Rev. 109, 110 (2015) ("[D]eciding the constitutional standard for *Garner*'s civil rights suit did not disturb what the standard had to be for state criminal law prosecutions. States still have the authority to dictate under what circumstances police could justifiably use deadly force, and so avoid punishment under state law.") (emphasis and footnotes omitted); *see id.* at 127 ("the Fourth Amendment does not require or mandate any criminal sanction for the officer who has violated" its terms).[12]

---

[12] Pointing to Ohio as an example, the DAO presently argues in its brief that other courts "have disagreed with" cases like *Couch* and concluded that *Garner* "frame[s] an officer's justification defense in a state criminal law prosecution." DAO's Brief at 49, *citing State v. White*, 29 N.E.3d 939 (Ohio 2015). The problem with this argument is that Ohio is one of the four states the *Garner* Court specifically observed was "without a relevant statute" and thus followed "the common-law rule." *Garner*, 471 U.S. at 16. The DAO's underlying claim here concerns *Garner*'s effect on state criminal law statutes, rendering common-law cases like *White* inapposite.

I discuss all of this not as an attempt to resolve the DAO's underlying constitutional claim. On that issue I reserve final judgment until such time as it may arise in a proper case. Rather, my point is merely to demonstrate how the DAO's motion in limine — much like the legal instructions it gave to the investigating grand jury — presented only half the relevant picture. This type of advocacy would be worrisome coming from any litigant. *See* Pa.R.P.C. 3.3 (providing that all attorneys have a duty of candor toward a tribunal). That it was the prosecution's doing is even more concerning, particularly in light of the motion's timing, which I now address.

The majority opinion describes the trial court's "discontent with the DAO's decision to wait until weeks before trial to present its motion challenging Section 508." Majority Opinion at 16 (internal quotations and citations omitted). The trial court's frustration was well founded, considering the DAO had "more than a year and two months" after Pownall's arrest to file its motion, yet it chose to wait until only weeks before trial was set to begin. Trial Court Op., 1/2/2020 at 2 n.2. But the timing of the DAO's motion was more than just frustrating: it also raises ethical concerns. Pownall filed his motion to quash the grand jury's presentment on December 18, 2019. Instead of responding to the accusations raised in that motion, five days later, counsel for the DAO "made an unscheduled appearance" in the trial court and demanded the court rule on its motion. Trial Court Op., 12/30/2019 at 1. It further warned the court it would take an immediate interlocutory appeal — with or without the court's permission — should the court deny its motion. *See id.* at 1-2. After the court did precisely that, the DAO followed through on its threat and filed the present improper appeal, thereby forestalling its need to answer Pownall's grand jury allegations by divesting the court of jurisdiction over the case.

When combined with the other tactics highlighted throughout this concurrence, a compelling argument may be made that the DAO's decision to delay Pownall's trial further

by taking an unauthorized interlocutory appeal was intended to deprive him of a fair and speedy trial.

Consider the total sum of what occurred below. The DAO secured from the grand jury, which operates under the cover of secrecy, a slanted presentment written by the DAO's own attorneys, based on its preferred facts. Although the grand jury signed on to the DAO's take on the case, it did so without full awareness of the relevant legal definitions for murder or the defense under Section 508. Then, the DAO had the presentment unsealed so it could be disseminated to the press, which uncritically reported the "grand jury's findings." Meanwhile, the DAO maneuvered to bypass Pownall's statutory right to a preliminary hearing, at which the DAO would have been required to subject its evidence to cross-examination and prove a *prima facie* case for third-degree murder. Having succeeded in that endeavor, the DAO next fought to keep the case in Philadelphia before a Philadelphia jury despite extensive local media coverage; that effort also succeeded.[13] Finally, as trial neared, there was only one obstacle that remained in the DAO's path to conviction: the legislatively authorized peace officer justification defense. So, the DAO, in the District Attorney's own words, did something "unusual" and "creative" — it challenged Section 508 and its corresponding suggested jury instruction because it

---

[13] Notably, the DAO argued that although prosecutorial sources "carry authority and may prejudice a venire[,]" the extensive publicity in Pownall's case was "not so reliant on" those sources. DAO's Brief on Defense's Motion for Change of Venire, 5/21/2019 at 3-4. But it turns out the same prosecutor who authored this statement, ADA Tripp, was in fact participating in a documentary focused on the DAO. In 2021, during the pendency of this appeal, that documentary aired on television, including an entire episode dedicated solely to Pownall's case. *See* Pownall's Brief at 60-61, *citing Philly D.A.*, Episode 7, (PBS July 1, 2021). That a prosecutor would think it appropriate to poison the well of public opinion by participating in a documentary concerning an ongoing case is unconscionable to me. *See, e.g.*, Pa.R.P.C. 3.8(e) ("except for statements that are necessary to inform the public of the nature and extent of the prosecutor's action and that serve a legitimate law enforcement purpose, [a prosecutor shall] refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused").

believed they are "not fair."  Pownall's Brief at 59, *citing* Chris Norris, *Philly DA Reflects on Chauvin Verdict, Where Case Against Former Officer Ryan Pownall Stands*, WHYY (Apr. 4, 2021), https://whyy.org/articles/philly-da-larry-krasner-reflects-on-chauvin-verdict-where-case-against-former-officer-ryan-pownall-stands/ (last visited July 19, 2022).  After the trial court refused the DAO's motion — and faced with having to respond to Pownall's pending motion to quash the grand jury's presentment — the DAO took an unauthorized interlocutory appeal, knowing it would (at least temporarily) nullify both of those problems.  Now, for the first time before this Court, the DAO finally admits its true intent in all this was simply to use Pownall's case as a vehicle to force a judicial determination on "whether Section 508(a)(1) is facially unconstitutional."  DAO's Reply Brief at 1; *see id.* at 6 (asserting "Section 508's applicability to [Pownall] is not the subject of this appeal").  What's more, despite having assured the trial court it was not trying "to bar [Pownall] from a defense[,]" N.T. 11/25/2019 at 8, the DAO now boldly asserts it would be appropriate for this Court to rewrite the law and retroactively apply it to Pownall's case because he supposedly "had fair notice of his inability to rely on this unconstitutional defense[.]"  DAO's Brief at 10.

We have explained a prosecutor has a responsibility to "seek justice within the bounds of the law, not merely to convict."  *Commonwealth v. Clancy*, 192 A.3d 44, 52 (Pa. 2018) (internal quotations and citation omitted).  This is because a prosecutor acts as "a minister of justice and not simply that of an advocate."  Pa.R.P.C. 3.8, Comment; *see, e.g.*, *Commonwealth v. Briggs*, 12 A.3d 291, 331 (Pa. 2011) (a prosecutor, "unlike a private attorney, must exercise independent judgment in prosecuting a case and has the responsibility of a minister of justice and not simply that of an advocate") (internal quotations and citation omitted).  As a minister of justice, a prosecutor shoulders a unique responsibility that "carries with it specific obligations to see that the defendant is accorded

procedural justice and that guilt is decided upon the basis of sufficient evidence." Pa.R.P.C. 3.8, Comment.

Little that has happened in this case up to this point reflects procedural justice. On the contrary, the DAO's prosecution of Pownall appears to be "driven by a win-at-all-cost office culture" that treats police officers differently than other criminal defendants. DAO CONVICTION INTEGRITY UNIT REPORT, OVERTURNING CONVICTIONS — AND AN ERA 2 (June 15, 2021), available at tinyurl.com/CIUreport (last visited July 19, 2022). This is the antithesis of what the law expects of a prosecutor.